**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **WSOU INVESTMENTS LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT**, | **C.A. NO. 6:20-cv-00487-ADA** |
| | **C.A. NO. 6:20-cv-00488-ADA** |
| *Plaintiff*, | **C.A. NO. 6:20-cv-00494-ADA** |
| | **C.A. NO. 6:20-cv-00496-ADA** |
| v. | |
| **ZTE CORPORATION, ZTE (USA) INC. AND ZTE (TX), INC.**, | |
| *Defendants*. | |

**<u>DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARDS ..........................................................................................2

    A.    Claim Construction .................................................................................2

    B.    Indefiniteness .........................................................................................3

    C.    Written Description.................................................................................3

III.   PRELIMINARY ISSUES.......................................................................................4

    A.    Sufficient Notice of Indefiniteness Theory Provided .............................4

    B.    Expert Testimony Not Required ..............................................................5

    C.    Enablement and Written Description Issues are Ripe for Analysis ........6

IV.   U.S. PATENT NO. 7,489,929 (CASE NO. 6:20-CV-00488-ADA) ...................6

    A.    Term 1: "buffering bearer traffic" (Claim 11) ......................................6

        1.    WSOU's Argument that the phrase requires no construction is incorrect. ...................................................................................7

        2.    WSOU's Arguments Contradict The '929 Patent Specification.................8

        3.    WSOU's Arguments Wipe Out The Entire Purpose Of The Buffering. ...............................................................................9

        4.    WSOU's Arguments Wipe Out The Alleged Invention. ..........................10

    B.    Terms 2-3: "characteristic" and "replacement hysteresis" (Claim 14).................13

V.    U.S. PATENT NO. 7,742,534 (CASE NO. 6:20-CV-00496-ADA) ................14

    A.    Term 1: "maximal number of sub-carriers" (Claims 4, and 7)............14

    B.    Term 2: "means for selecting" / "means for determining" (Claim 6)...................15

        1.    WSOU's Arguments Regarding The Number Of Terms Are Incorrect. ...............................................................................16

        2.    WSOU's Fails To Rebut The Presumption About Means-Plus-Function Terms. ...................................................................16

3.      WSOU's Proposed Construction For "Means For Selecting" Is Improper.................................................................................18

4.      The Limitations are Governed by 35 U.S.C. § 112(f) and Fails to Provide Support for the Claimed Function .................................19

C.      Term 3: "quality level" / "as a function of" (Claims 1, 2, 3, 5-9, 13, 16-18) ........19

VI.     U.S. PATENT NO. 8,451,839 (CASE NO. 6:20-CV-00487-ADA) ................................21

A.      Term 1: "route" / "route-related information" (Claims 1, 3, 6, 8, and 11) ...........21

1.      The term "route" and "route-related information" lacks discernable meaning and antecedent basis....................................................21

2.      WSOU's allegation that Defendants are seeking to construe two terms is incorrect.....................................................................23

B.      Term 2: "said predefined using time indicates[ing] a [the] using time of said route" (Claims 1 and 6) ...................................................23

1.      The term "said predefined using time indicates[ing] a [the] using time of said route"..........................................................23

C.      Term 3: "using time" (Claims 1, 6) ...................................................24

1.      The term "using time" lacks antecedent basis in claim 6 .........................24

VII.    U.S. PATENT NO. 9,185,036 (CASE NO. 6:20-CV-00494-ADA) ................................25

A.      Term 1: "data flow" / "to enable thereby the control of at least one data flow" / "data flow is controlled" / "a data flow" / "the data flow" (Claims 1, 6,-10, 12, 17-21, and 23-24) ...................................................25

1.      The '036 patent specification fails to describe the claimed "data flow" ..............................................................25

2.      WSOU's allegation that Defendants are seeking to construe five terms is incorrect.....................................................................28

B.      Term 2: "congestion condition to enable thereby the control of at least one data flow in a manner tending to reduce the congestion condition" / "congestion condition" / "indication that a congestion condition exists" (Claims 1, 12, 23, and 24)...............................................................28

1.      The '036 patent specification fails to describe the claimed "congestion condition"..........................................................28

2.    WSOU's allegation that Defendants are seeking to construe five
      terms is incorrect. ................................................................................29

C.    Term 3: "end-node associated with the congestion condition" (Claims 1,
      12, 23, and 24) ..........................................................................................29

      1.    The '036 patent specification does not contain a written description
            of or enable a POSA to practice the claimed "end-node associated
            with the congestion condition" .................................................................30

VIII.  CONCLUSION .........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
   725 F.3d 1315 (Fed. Cir. 2013)...................................................................................3

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) ...............................................................4

*Azure Networks, LLC v. CSR PLC*,
   771 F.3d 1336 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959
   (2015)..........................................................................................................................2

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)..................................................................................15

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009)............................................................................17, 20

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
   224 F.3d 1308 (Fed. Cir. 2000)..................................................................................25

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004)......................................................................................3

*In re Donaldson Co.*,
   16 F.3d 1189 (Fed. Cir. 1994) (en banc)....................................................................17

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012)......................................................................................3

*Flash-Control, LLC v. Intel Corporation*,
   2020 WL 4561591 (W.D. Tex. July 21, 2020) ............................................................6

*Function Media, LLC v. Google Inc.*,
   708 F.3d (Fed. Cir. 2013)...........................................................................................20

*H-W Technology, L.C. v. Overstock.com, Inc.*,
   758 F.3d 1329 (Fed. Cir. 2014)....................................................................................6

*Halliburton Energy Servs. V. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008).......................................................................... *passim*

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
   902 F.3d 1372 (Fed. Cir. 2018)..................................................................................15

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)................................................................................6

*Lecat's Ventriloscope v. MT Tool & Mfg.*,
   351 F. Supp. 3d 1100 (N.D. Ill. 2018) ..................................................................5

*Lucent Technologies, Inc. v. Gateway, Inc*.,
   525 F.3d 1200 (Fed. Cir. 2008)........................................................................14, 19

*Mantech Environmental Corp. v. Hudson Environmental Services, Inc. .*,
   152 F.3d 1368 (Fed.Cir.1998).................................................................................8

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc).................................................................8

*Nautilus Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)............................................................................................3, 21

*Novo Indus., L.P. v. Micro Molds Corp*.,
   350 F.3d 1348 (Fed. Cir. 2003)............................................................................13

*O.I. Corp. v. Tekmar Co*.,
   115 F.3d 1576 (Fed. Cir. 1997)............................................................................16

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .....................................................2, 3, 9

*Seattle Box Co. v. Indus. Crating & Packing, Inc.*,
   731 F.2d 818 (Fed. Cir. 1984)..............................................................................14

*Secor View Techs. LLC v. Nissan N. Am., Inc., No. 12-3306 (FSH)*,
   2013 WL 6147788 (D.N.J. Nov. 21, 2013) .........................................................15

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008)..............................................................................21

*Spansion, Inc. v. Int'l Trade Comm'n*,
   629 F.3d 1331 (Fed. Cir. 2010).............................................................................5

*SunRace Roots Enterprise Co., Ltd. v. SRAM Corp.*,
   336 F.3d 1298 (Fed. Cir. 2003)............................................................................20

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)......................................................................2, 3, 24

*USB Bridge Sols., LLC v. Buffalo Inc.*,
   1-17-CV-001158-LY, 2020 WL 1906898 (W.D. Tex. Apr. 17, 2020) ...................6

*V-Formation, Inc. v. Benetton Group SpA,*
    401 F.3d (Fed. Cir. 2005) ............................................................................................21

*Vasudevan Software v. MicroStrategy, Inc.,*
    782 F.3d 671 (Fed. Cir. 2015) .......................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .......................................................................................8

*Widevine Techs., Inc. v. Verimatrix, Inc.,*
    2009 WL 3734106 (E.D. Tex. 2009) ...........................................................................18

*Zadro Prods., Inc. v. SDI Techs., Inc.,*
    No. 17-1406 (WCB), 2019 WL 10252726 (D. Del. June 19, 2019) ............................15

**Statutes**

35 U.S.C. § 112(1) .................................................................................................................2

35 U.S.C. § 112(2) .................................................................................................................2

35 U.S.C. § 112(6) .................................................................................................................2

35 U.S.C. § 112(a) .............................................................................................................2, 29

35 U.S.C. § 112(b) ........................................................................................................ *passim*

35 U.S.C. § 112(f) ........................................................................................................ *passim*

35 U.S.C. § 112, ¶ 1 ...............................................................................................................3

35 U.S.C. § 112, ¶ 2 ...................................................................................................3, 17, 25

35 U.S.C. § 112, ¶ 6 .................................................................................................15, 16, 19

Patent Act ...............................................................................................................................3

**Other Authorities**

Wiley-IEEE Electrical and Electronics Engineering Disctionary, p. 84 (2004) (Ex.
    7) ....................................................................................................................................7

Pursuant to the Court's First Amended Scheduling Order (Dkt. No. 45)[1] and the Court's February 26, 2021 e-mail order, Defendants ZTE Corporation, ZTE (USA) Inc., and ZTE (TX), Inc. (collectively "ZTE") hereby submits the following opening responsive claim construction brief pursuant to the Order Governing Proceedings ("OGP").

## I.     Introduction

Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development ("WSOU") asserts eleven patents in *eleven* separate cases. In order to circumvent the OGP standards for claim construction term limits and briefing page limits, and in order to circumvent reducing the number of asserted claims in these cases (WSOU maintains and asserts at least 140 claims), WSOU insisted on consolidating all eleven different patents into unrelated groupings for this claim construction briefing. *See* Dkt. 60, Exs. 1-2. As such, four patents—U.S. Patent Nos. 7,489,929; 7,742,535; 8,451,839; and 9,185,036—are briefed herein.

None of these four patents share a common specification, and each is directed towards different technology—despite WSOU's insistence on these technical groupings (with reduced terms and briefing). For instance, first, the '929 patent is directed towards **wireless communication network handoffs**. The '929 patent at 3:47-48. Second, the '534 patent is directed towards **optimizing the use of feedback in multi-carrier systems**. The '534 patent at 1:10-13. Third, the '839 patent is directed towards **creating communication network routes in access devices**. The '839 patent at Abstract. Fourth, the '036 patent is directed towards **reducing local are network congestion**. The '036 patent at 1:25-50.

---

[1] There are 11 pending cases.  Citations throughout refer to new WDTX Case Nos. -00487 through -00497, and specific citations reference to the docket for WDTX Case No. -00487.

Nevertheless, many of the claims are written in functional language without sufficient structure for performing those functions, rendering them subject to 35 U.S.C. § 112(f).[2] Additionally, because the specifications lack disclosure for performing most of those claimed functions, those claims are indefinite. In some instances, the specifications further fail to provide sufficient support under § 112(a) or § 112(b) and are further indefinite for those reasons. For several other terms, Defendants propose constructions consistent with their use in the intrinsic record, rather than—as WSOU seeks—divorcing them from that context.

## II.    Legal Standards

### A.    Claim Construction

The general rule is that claim terms are generally given their plain-and-ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959, 959 (2015). And, the plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313.

There are two exceptions, however, to this general rule that terms are generally given their plain-and-ordinary meaning. The two exceptions are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To act as his/her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* To disavow the full scope of a

---

[2] For consistency, Defendants' references to § 112(a), (b), or (f) are synonymous with § 112(1), (2), or (6) and not intended to reflect any specific meaning to respective patent priority dates and application of AIA or Pre-AIA law.

claim term, the patentee's statements in the specification or prosecution history must represent "a clear disavowal of claim scope." *Id.* at 1366. Accordingly, when "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Additionally, extrinsic evidence may be useful in determining the meaning of claim terms, albeit it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Technical dictionaries may also be helpful. *Id.* at 1318.

## B.    Indefiniteness

It is undisputed that patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. Further, "indefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). This requirement is necessary so that others of skill in the art will have fair notice as to what is off limits in the field and what is available for exploration. *Halliburton Energy Servs. V. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Failure to comply with this requirement results in invalidity of the patent. If not, the claim fails § 112, ¶ 2 and is invalid as indefinite. *Nautilus* at 901.

## C.    Written Description

The Patent Act further states, under 35 U.S.C. § 112, ¶ 1, that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112,

3

¶ 1. "The test for the sufficiency of the written description 'is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Vasudevan Software v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*)). "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Vasudevan*, 782 F.3d at 682 (citing *Ariad*, 598 F.3d at 1351). Whether the written description adequately supports a patent claim is a question of fact. *Id.* (citing *Ariad*, 598 F.3d at 1355). "A party must prove invalidity for lack of written description by clear and convincing evidence." *Id.*

## III.    Preliminary Issues

### A.    Sufficient Notice of Indefiniteness Theory Provided

WSOU generally alleges that "ZTE [ ] failed to provide any notice as to any indefiniteness theory," for several terms below.  *See e.g.*, WSOU Opening Brief, p. 6. This is incorrect. Not only is this allegation patently false—as discussed below Defendants provided ample notice, but WSOU provides no case law indicating the level of notice provided was insufficient (because the notice was sufficient).

First, Defendants provided ample notice of the indefiniteness theories below. For instance, in Defendants' Invalidity Contentions dated January 6, 2021, Defendants clearly identified the terms below as indefinite. *See* WSOU Opening Brief, Ex. A, pp. 52-63. This is a sufficient notice. Nevertheless, Defendants further identified the terms below for indefiniteness in the subsequent January 22, 2021 Proposed Terms for Claim Construction (Ex. 1), the February 12, 2021 Proposed Claim Constructions (Ex. 2), the February 19, 2021 Disclosure of Extrinsic Evidence (Ex. 3), the February 26, 2021 Narrowed Claim Terms (Ex. 4), and the March 2, 2021 Second Narrowed Claim Terms (Ex. 5). *See also* Dkt. 60, Exs. 1-2. In fact, *WSOU* itself even generated a claim summary

4

chart listing these indefiniteness terms below for each respective patent and presented it to the Court. *See* Dkt. 60, Ex. 1 (February 12, 2021 Emails from WSOU explaining chart supporting WSOU's position for consolidated terms and briefing); *see also* Ex. 6. Given this plethora of notice, it is now improper for WSOU to allege "absence of *any* notice," and the Court should disregard WSOU's argument.  WSOU Opening Brief, p. 6.

Second, Defendants clearly indicated that these terms failed "to satisfy the requirements of § 112(b) because the claims fail to point out and distinctly claim the subject matter which the inventors regard as the alleged invention." *See* WSOU Opening Brief, Ex. A, pp. 52-63. There is no other theory or standard, under both AIA and pre-AIA, for determining whether a claim is definite or indefinite. Therefore, WSOU is incorrect because sufficient notice was provided and WSOU is not prejudiced.

Lastly, in view of the ample notice discussed above, and considering that WSOU only *first* raised any notice issue now for this briefing, it is clear that WSOU waived any notice objections. The proper time for notice objections—if at all—was the months prior to these claim construction briefings.

### B.    Expert Testimony Not Required

WSOU further erroneously alleges that Defendants "waived any reliance on expert testimony to support its position[s]," and therefore are unable to "possibly meet [their] burden" for several indefinite terms. *See e.g.*, WSOU Opening Brief, p. 5. This is untrue, however, because the Federal Circuit made it clear that extrinsic evidence, such as expert testimony, *may be used*, but refrained from requiring expert testimony for proving invalidity for indefiniteness.  *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1344 (Fed. Cir. 2010); *see also Lecat's Ventriloscope v. MT Tool & Mfg.,* 351 F. Supp. 3d 1100, 1113 (N.D. Ill. 2018) (finding that "expert testimony is not *per se* required" for indefiniteness and further finding that the "lack of expert testimony [ ] is

not fatal.") In fact, courts routinely determine indefiniteness issues without supporting expert testimony. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) and *H-W Technology, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329 (Fed. Cir. 2014) (both affirming district court rulings of indefiniteness without supporting expert testimony).

### C.    Enablement and Written Description Issues are Ripe for Analysis

WSOU incorrectly alleges that "this Court instructed 'patent validity arguments like lack of enablement and lack of written description are not proper during claim construction proceedings.'" *See e.g.*, WSOU Opening Brief, p. 23. For this allegation, however, WSOU fails to reference any decision by *this* Court. *See USB Bridge Sols., LLC v. Buffalo Inc.*, 1-17-CV-001158-LY, 2020 WL 1906898, at *5 (W.D. Tex. Apr. 17, 2020). In contrast, *this* Court permits enablement and lack of written description analysis at the Claim Construction phase. *See Flash-Control, LLC v. Intel Corporation*, 2020 WL 4561591 (W.D. Tex. July 21, 2020) (Judge Albright ruling on enablement and lack of written description issues in Claim Construction Order). Thus, it is clear that *this* Court considers enablement and lack of written description issues ripe for analysis during claim construction.

Lastly, WSOU only *first* raised this written/description issue now for this briefing—well after this issue was raised and analyzed during the term reduction. *See* Dkt. 60, Ex. 1; *see also* Ex. 6. As such, WSOU waived any objections. The proper time for objection—if at all—was the months prior to these claim construction briefings.

## IV.    U.S. Patent No. 7,489,929 (Case No. 6:20-cv-00488-ADA)

### A.    Term 1: "buffering bearer traffic" (Claim 11)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "During a handoff process, all data from the mobile station is buffered at the mobile station or all data at the network side is |

| | buffered at the network side until the handoff process is complete." |
|---|---|

**1.      WSOU's Argument that the phrase requires no construction is incorrect.**

WSOU argues that the phrase "buffering bearer traffic" requires no construction because the claim language itself expressly qualifies the "buffering" in terms of what must be buffered, and when. *See* WSOU Opening Brief, p. 2. WSOU is incorrect. Buffering bearer traffic not only requires specifically what must be buffered and when, but also requires to qualify *where* to buffer and *how long* to buffer, as discussed below.

**i.      Buffering data requires a temporary storage place.**

"Buffering" is an operation of temporarily storing data being sent or received. *See* Ex. 7, Wiley-IEEE Electrical and Electronics Engineering Dictionary, p. 84 (2004). Storing data requires a tangible, physical device (e.g., a memory device) to store the data.

Here, user data can be buffered at three locations—the mobile station, the network device, or at a place other than the mobile station and the network side.  These different buffering options require different hardware (e.g., memory device) and/or software implementation, and cause different data transmission paths.

Therefore, identifying the place to buffer is important to determine the scope of the claim. Claim construction is required here because claim 11 is the only claim reciting the buffering in the '929 patent, and yet fails to identify the place to buffer, e.g., at the mobile station, at the network side, or at a place other than the mobile station and the network side. Therefore, WSOU's argument is incorrect.

**ii.      Buffering data requires a duration for buffering.**

As mentioned above, "buffering" is an operation of *temporarily* storing data being sent or received, thus the duration is critical for construction as well. In the context of the '929 patent, the

temporality of buffering depends on the handoff process. Termination of buffering before completion of the handoff process would result in the risk of data packet loss. On the other hand, delays in termination of buffering after the completion of the handoff process would result in transmission delay of user data. Therefore, the duration of buffering is important because it affects the configuration and performance of the system, and thus, directly affects the scope of the claims.

### 2.      WSOU's Arguments Contradict The '929 Patent Specification.

When the claim term itself fails to inform a person of ordinary skill in the art (POSITA) the metes and bounds of the alleged invention, such as the case here, "in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "When construing a claim, a court principally consults the evidence intrinsic to the patent, including the claims, the written description, and any relevant prosecution history." *Mantech Environmental Corp. v. Hudson Environmental Services, Inc. .,* 152 F.3d 1368, 1371 (Fed.Cir.1998); *see also Markman,* 52 F.3d at 979 ("To ascertain the meaning of claims, we consider three sources: The claims, the specifications, and the prosecution history.").

Regarding the claimed buffering, the '929 patent specification describes as follows:

> Another feature of the disclosed example is that all user data for a mobile station involved in the example handoff process is buffered during the handoff process. **In other words, all data from the mobile station is buffered at the mobile station and all data at the network side is buffered at the network side until the handoff process is complete**. The '929 patent, 6:34-39.

(Emphasis added).

In fact, the above description is the only description in the '929 patent specification regarding the claimed buffering, and Defendants' proposed claim construction is based on this

description. As best understood, the "all data from the mobile station" refers to data in the mobile station *at the time* of the buffering, rather than the data at the network side. Similarly, the "all data at the network side" refers to data at the network side at the time of the buffering, rather than the data in the mobile station. That is, in the context of the '929 patent specification, the term "all data" focuses on the place where the data is physically located at the time of buffering, and thus, "all data" should be understood in connection with either "from the mobile station" or "at the network side." In other words, all data must be either "all data from the mobile station" or "all data at the network side".

However, WSOU isolates the term "all data" from "the mobile station" and "the network side," and argues that use of the term "all data" is incorrect. *See* WSOU Opening Brief, p. 3. In particular, WSOU argues that: ""all data" is not necessarily buffered. This is because step (C) expressly requires "*transmitting an active set update message* to the mobile station using the existing link between the serving base station and the mobile station." *Id*. That is, WSOU is effectively arguing that the above description of the '929 patent specification is incorrect because some of the "all data" needs to be transmitted, but not be buffered. Therefore, WSOU's arguments merely amount to attack to the '929 patent specification for lack of Enablement.

The main problem of WSOU's argument regarding the "all data" is that it focuses the abstract meaning of isolated words rather than on the meaning of claim terms within the context of the patent, and thus, the term is divorced from its particular context, which is the specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005).

### 3. WSOU's Arguments Wipe Out The Entire Purpose Of The Buffering.

WSOU argues that the proposed claim construction term of "until the handoff process is complete" is incorrect because it requires buffering "must last *for the entire duration* of a so-called

9

"*handoff process*."" *See* WSOU Opening Brief, p. 3. That is, WSOU argues that the buffering should be terminated before the handoff process is complete. This argument is incorrect.

This argument indicates WSOU lacks understanding of the technology related to the alleged patent. The purpose of the buffering is to prevent data packet loss during the handoff process and ensure reliability of user data transmission. The '929 patent also describes that "[i]n other words, all data from the mobile station is buffered at the mobile station and all data at the network side is buffered at the network side **until the handoff process is complete**. This further allows fast and **reliable switching** to the strongest target base station while avoiding soft handoff for high speed shared channels and the associated dedicated channels." The '929 patent, 6:36-42 (emphases added).

Therefore, if buffering of user data is terminated before the handoff process is complete, as argued by WSOU, then the communication system would be at risk of data packet loss, and cannot guarantee a reliable switching between the base stations. Therefore, WSOU's arguments wipe out the entire purpose of buffering.

### 4.      WSOU's Arguments Wipe Out The Alleged Invention.

WSOU argues that use of the term "a handoff process" is incorrect because this is "not recited in any of the claims." *See* WSOU Opening Brief, p. 3. That is, WSOU argues that the process occurring during the step (A) through step (F) recited in claim 1 is not a handoff process of the '929 patent.

Defendants note that at least claims 1, 3, 8, 10, and 15 recites the term "handoff." Also, it is well-known in the art that a "handoff" is a process, rather than an apparatus or a device. As such, claim 1 is written as a collection of steps, i.e., steps (A) through (F). Further, according to the '929 patent specification, the process occurring during step (A) through (F) effectively defines the handoff process of the '929 patent. In particular, claim 1 recites "(A) determining if a **handoff** is

desired between the serving base station and the target base station." After the determining in step (A), step (B) through (F) follow, in which step (F) is a step of "releasing the existing link responsive to the at least one signal of step (E)," indicating the handoff is effectively completed.

Moreover, the '929 patent specification describes that "**FIGS. 2** and 3 illustrate an example **handoff procedure** designed according to an embodiment **of this invention**." The '929 patent, 5:4-5 (emphases added). As shown below in annotated FIG. 2, the handoff procedure of '929 patent starts at step 52 (corresponding to step (A) of claim 1), and effectively ends at step 70 (corresponding to step (F) of claim 1), and step 72 is the natural consequence of step 70.



The '929 patent, FIG. 2 (annotated)

Therefore, by arguing that the process occurring during step (A) through (F) is not the handoff process of the '929 patent, WSOU wipes out the alleged invention.

Further, WSOU argues "that certain dependent claims recite additional processing steps (e.g., claims 6, 8, 9, 10, etc.). This reveals that steps (A) through (F) cannot properly be interpreted as necessarily reciting (collectively) an exhaustive set of steps for a so-called "handoff process." Case 6:20-cv-00487-ADA, page 8, lines 18-20. That is, WSOU is effectively arguing that the steps recited in claims 6, 8, 9, and 10 do not occur during the step (A) through (F). This is incorrect.

As shown below in annotated FIG. 2, the steps recited in other dependent claims, e.g., claims 6, 8, 9, and 10, all occur during the step (A) through (F).



The '929 patent, FIG. 2 (annotated)

Therefore, by arguing that the additional steps recited in dependent claims 6, 8, 9, and 10 are not the steps occurring during step (A) through (F), WSOU effectively distorts the alleged invention of the '929 patent.

In sum, WSOU's arguments fail and the term "buffering bearer traffic" should be construed as that "during a handoff process, all data from the mobile station is buffered at the mobile station or all data at the network side is buffered at the network side until the handoff process is complete."

**B.      Terms 2-3: "characteristic" and "replacement hysteresis" (Claim 14)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

Second, with respect to "characteristic," the '929 patent fails to mention the term at all. And the plain and ordinary meaning of the term (e.g., "a distinguishing trait, quality, or property" as defined in Merriam Webster online dictionary) is extremely broad so it mean anything untethered by the claims and scope of the patent.

Additionally, WSOU was unable to point to any portion of '929 patent specification supporting the term "characteristic." *See* WSOU Opening Brief, p. 7. WSOU was unable to point out what the "characteristic" is because the term is entirely without support in the '929 patent specification. As such, the term is "not amenable to construction" without a speculation or a blind guessing, and thus the term is indefinite. *See Novo Indus., L.P. v. Micro Molds Corp*., 350 F.3d 1348, 1353 (Fed. Cir. 2003). For similar reasons, the term 'replacement hysteresis' is also indefinite.

The allegations made by WSOU would not cure the error made in drafting the claims and would not make the indefinite terms become definite. The Federal Circuit has repeatedly held that "courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity." *Lucent Technologies, Inc. v. Gateway, Inc*., 525 F.3d 1200,

125-26 (Fed. Cir. 2008). Thus, because the scope of the claims is not "sufficiently definite to inform the public of the bounds of the protected invention," the claims defeat the public notice function and the claims should be found invalid. *Halliburton Energy Servs. V. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Therefore, the term "characteristic" and the term "replacement hysteresis" are indefinite under 35 U.S.C. § 112(b).

## V.   U.S. Patent No. 7,742,534 (Case No. 6:20-cv-00496-ADA)

### A.   Term 1: "maximal number of sub-carriers" (Claims 4, and 7)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

Second, with respect to this term, the term "maximal number of sub-carriers" is a term of degree.[3] Therefore, the patent must provide "some standard for measuring that degree." *Seattle Box Co. v. Indus. Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed. Cir. 1984).

The '534 patent specification fails to provide standards to guide a skilled artisan on the meaning of "maximal[um] number of sub-carriers," as there is no description regarding a large, small, most, or least number of subcarriers or what constitutes when a maximum or maximal number of subcarriers is reached. *See generally* the '534 patent. Indeed, this term only appears in the claims. Thus, the term is insolubly ambiguous, rendering the phrase indefinite. *See*, *Secor View Techs. LLC v. Nissan N. Am., Inc., No. 12-3306 (FSH)*, 2013 WL 6147788, at 4 (D.N.J. Nov. 21, 2013); (determining that the term "minimize lateral protuberance from the side of the vehicle" was

---

[3] It is noted that WSOU raises concern for the term in claim 7, "a maximum number of sub-carriers," as a distinct phase. *See* WSOU Opening Brief, fn. 5. It is clear, however, that "a maximum" and a "maximal" number of sub-carriers suffer from the same term of degree issues discussed herein—as such this discussion is properly counted as one term.

a term of degree, that the patent's specification did not discuss the term, and that a POSITA "is not provided with a standard to determine when lateral protuberance becomes minimized."); *see also Halliburton Energy Servs., Inc. v. M–I LLC,* 514 F.3d 1244, 1249-50 (Fed. Cir. 2008); *see also Berkheimer v. HP Inc.,* 881 F.3d 1360, 1363-64 (Fed. Cir. 2018) (affirming district court's holding that the term "minimal redundancy" was indefinite as a term of degree because the specification lacked objective boundaries or examples of what constitutes "minimal"). *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (finding " 'optimiz[ing] . . . QoS' " indefinite as it is "a 'term of degree' that is 'purely subjective' and . . . 'fails to provide one of ordinary skill in the art with any way to determine whether' QoS has been 'optimiz[ed].' "); *Zadro Prods., Inc. v. SDI Techs., Inc.*, No. 17-1406 (WCB), 2019 WL 10252726, at *3 (D. Del. June 19, 2019) (finding claim term indefinite because the specification and the claims "provide[] no guidance as to what . . . would satisfy" the claim term.).

Therefore, the term "maximal number of sub-carriers" is indefinite.

### B.    Term 2: "means for selecting" / "means for determining" (Claim 6)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not subject to 35 U.S.C. § 112, ¶6. If construed as means-plus-function under § 112, ¶6, however, then Function: "selecting said set of sub-carriers on which said user data is to be received from said transmitter" and Structure: receiver. | "Governed by 35 U.S.C. § 112(f)<br><br>Function: selecting a set of sub-carriers from the plurality of sub-carriers on which user data is to be communicated from a transmitter to a receiver / determining quality levels for sub-carriers<br><br>Indefinite under 35 U.S.C. § 112(b) Structure: none disclosed." |

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not subject to 35 U.S.C. § 112, ¶6. | "Governed by 35 U.S.C. § 112(f)<br><br>Function: determining quality levels for sub-carriers |

15

| If construed as means-plus-function under § 112, ¶6, however, then Function: "determining quality levels for sub-carriers" Structure: receiver. | Indefinite under 35 U.S.C. § 112(b) Structure: none disclosed." |
|---|---|

### 1.    WSOU's Arguments Regarding The Number Of Terms Are Incorrect.

WSOU argues that the term "means for selecting" and the term "means for determining" are distinct terms and accuses that Defendants improperly counted these two distinct terms as one. Following this logic, the two *distinct* terms should have *distinct* structures. Ironically, as shown above, WSOU also argues that the two *distinct* terms are the same thing – the receiver. This self-contradiction makes WSOU's entire arguments nonsense.

It is indisputable that the Court's analysis for both are intertwined. Defendants presented the two terms together because the terms are at the same position: both are included in the same claim with the same alleged structure (as alleged by WSOU)—that performs different functions. Therefore, WSOU's arguments fail.

### 2.    WSOU's Fails To Rebut The Presumption About Means-Plus-Function Terms.

The "price that must be paid" for use of means-plus-function claim language is the limitation of the claim to the means specified in the written description and equivalents thereof. *See O.I. Corp. v. Tekmar Co*., 115 F.3d 1576, 1583 (Fed. Cir. 1997). "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have 'failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112,' which renders the claim invalid for indefiniteness." *Blackboard, Inc. v. Desire2Learn, Inc*., 574 F.3d 1371, 1382 (Fed. Cir. 2009), quoting *In re Donaldson Co*., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc).

The '534 patent specification fails to provide any structure for the term "means for selecting" or "means for determining". The only descriptions, 5:38-52, make it clear that the '534 patent specification does not provide any structure for the term "means for selecting" or "means for determining. WSOU argues that the structure of both "means for selecting" and "means for determining" is the receiver, and 'receiver' itself connotes definite structure. WSOU is incorrect.

The 'receiver' here is not a generic, well-known receiver in cellular radio communication. Rather, the 'receiver' here is the very element of the alleged invention, and the claimed "means for selecting" and "means for determining" are the key components of the receiver. For example, the '534 patent specification describes that "[a] **particular object of the present invention is to provide** a method for sending information on the sub-carriers to be used between a **transmitter** and a **receiver** in a more efficient way so that the amount of signaling information in the feed forward carrier is reduced but anyway sufficient for performing an efficient resource allocation in the multi carrier system. **Another object of the invention is to provide a corresponding receiver**," (the '534 patent, 2:1-8), and that "FIG. 4 shows an implementation for a **receiver according to the present invention**." The '534 patent, 5:36-37 (emphases added).

And yet, the '534 patent specification does not provide any structure of the claimed 'receiver'. A person of ordinary skill in the art (POSITA) would not even understand the claimed "means for selecting" or "means for determining" are hardware or software. As such, the claims defeat "the public notice function of patent claims." *Halliburton Energy Servs. V. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Further, courts have previously recognized that these similar terms connote functions, not structure. *See Widevine Techs., Inc. v. Verimatrix, Inc.*, 2009 WL 3734106, at *14-15 (E.D. Tex. 2009), (finding (1) "receiving a packet," (2) "examining a payload portion of the packet …," (3)

"communicating the selectively encrypted portions over the network in a packet"; (4) "receiving the communicated packet"; and (5) "parsing the received packet …" to be functions that lacked algorithmic support).

Therefore, the terms "means for selecting" and "means for determining" should be construed as means-plus-function terms under 35 U.S.C. § 112(f).

### 3.   WSOU's Proposed Construction For "Means For Selecting" Is Improper.

Further, WSOU argues that if the term "means for selecting" is construed as means-plus-function under § 112, ¶6, then the corresponding function should be construed as "selecting said set of sub-carriers on which said user data is to be received from said transmitter".

The relevant part of claim 6 recites: "means for selecting a set of sub-carriers from the plurality of sub-carriers on which user data is to be communicated from a transmitter to a receiver." WSOU attempts to expand the scope of the claim by removing the "the plurality of sub-carriers". If the term "plurality of sub-carriers" is removed, the claimed 'selecting' is actually not a selecting, rather, it is just a taking whatever it has. This Court should not allow such a rewriting of the claims. The Federal Circuit has repeatedly held that "courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity." *Lucent Technologies, Inc. v. Gateway, Inc*., 525 F.3d 1200, 125-26 (Fed. Cir. 2008).

In sum, the term "means for selecting" and the term "means for determining" should be construed as means-plus-function terms under 35 U.S.C. § 112(f), and the corresponding function of the term "means for selecting" should be "selecting a set of sub-carriers from the plurality of sub-carriers on which user data is to be communicated from a transmitter to a receiver / determining quality levels for sub-carriers."

18

    **4.**    **The Limitations are Governed by 35 U.S.C. § 112(f) and Fails to Provide Support for the Claimed Function**

Because the limitations are governed by 35 U.S.C. § 112(f), the specification must disclose a clearly linked function. It does not. WSOU's identification, WSOU Opening Brief, pp. 10-12, amounts to nothing more than a restatement of the claimed function, which is insufficient, because it says nothing about ***how*** to perform the claimed function. *See Blackboard*, 574 F.3d at 1383; *Function Media, LLC v. Google, Inc.*, 708 F.3d at 1318–19 (Fed. Cir. 2013). Accordingly, the claim terms are indefinite.

    **C.**    **Term 3: "quality level" / "as a function of" (Claims 1, 2, 3, 5-9, 13, 16-18)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "One of a signal-to-interference ratio, a bit error rate, or a modulation scheme." |

The full phrase of the relevant claim 1 demonstrates how these terms are intertwined[4] (emphases added):

> at said receiver, selecting said set of sub-carriers on which said user data is to be transmitted **as a function of** said indication and of **said quality levels**.

The term "as a function of . . . said quality levels" is indefinite because each part "quality level" and "as a function of" is indefinite.

First, as to the "as a function of", there are numerous different types of functions (e.g., linear, quadratic, polynomial, etc.), and it is not clear what kind of function the claim refers to. The '534 patent specification fails to clarify it.

---

[4] WSOU alleges that Defendants violate the doctrine of claim differentiation. WSOU Opening Brief, pp. 13-14. WSOU is incorrect. The doctrine of claim differentiation does not apply here because both the "quality level" and the "as a function of" are recited in the same claim (claim 1)—not separate claims as addressed by *SunRace. See SunRace Roots Enterprise Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1302–03 (Fed. Cir. 2003) (ruling on differences between independent and dependent claims).

Second, as to the "quality level", Defendants' proposed construction is based on the '534 patent specification. The relevant portion of the '534 patent specification describes:

> According to the present invention, the additional and concordant information present at the transmitting base station 12 as well as at the receiving mobile terminals 11 are a quality level for the different sub-carriers of the system. Preferably, such an information is the SIR for the different sub carriers as measured at mobile terminals 11 and sent on the feedback carrier to the base station 12. . . . Alternatively, the quality level for each sub-carriers may be a bit error rate. The '534 patent, 3:14-26.

> The apparatus set forth in claim 6 wherein each sub-carrier quality level identifies at least one of a signal-to-interference ratio, a bit error rate, and a modulation scheme for a corresponding sub-carrier or a corresponding sub-carrier group. The '534 patent, Claim 8.

The '534 patent specification does not provide any other type of quality level. However, WSOU attempts to expand the scope of the claim beyond the disclosure of the '534 patent without providing technological context or enablement. As mentioned above, the '534 patent specification does not even name any quality level other than the signal-to-interference ratio, bit error rate, and modulation scheme. WSOU attempts to expand the scope without a boundary, thus this term requires construction.

Courts repeatedly rejected such improper expansion of the scope of the claims. The Supreme Court stated that a claim is indefinite if, read in light of the intrinsic record, it fails to inform those skilled in the art about the scope of the invention with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). *See* also *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008) ("The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims.") (internal quotes and citation

omitted); *see* also *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d at 1310 (Fed. Cir. 2005) ("[The intrinsic evidence] usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary sill at the time of the invention.").

Therefore, this Court should not allow such improper expansion of the scope of the claims. In sum, the term "as a function of . . . said quality levels" requires claim construction as proposed by Defendants in view of the context of the specification.

## VI.    U.S. Patent No. 8,451,839 (Case No. 6:20-cv-00487-ADA)

### A.    Term 1: "route" / "route-related information" (Claims 1, 3, 6, 8, and 11)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112(b) |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

### 1.    The term "route" and "route-related information" lacks discernable meaning and antecedent basis

Second, the term "route" as used in claims 1 and 6 lacks discernable meaning which is compounded by the lack of antecedent basis. The specification and claims fail to state what the claimed route is or what it connects to and the claimed route's relationship to other elements in the claim. *See* the '839 patent.

Each independent claim recites "said route" but fails to recite "a route." This is not an antecedent basis issue that may be fixed in hindsight because it is unclear what "route" is being referred to and what the "route" connects. Indeed, this term is only used in relation to a "using time" but lacks any other defining features such as how the route may relate to the claimed "access device" and "server." And this lack of information regarding "route" matters because the ambiguity of the claimed "said route" extends to the recitations of "route related information."

The "route-related information" may or may not apply to the claimed "said route," and it is further unclear what route is referred to by the "route-related information."

The specification specifies that the route is created because the "summary of the invention" recites "[t]he object of the present invention is to provide a method, in access devices of the communication network, for making use of access response messages to *create routes*." The '839 patent, 3:14-19 (emphasis added). The Abstract also states that "[t]he present invention provides a method for creating routes in access devices by using access response messages." *Id.*, Abstract. This is the only reference to a route in the Abstract or Summary, and the only other references to "a route" or "said route" is that the route has a using time. *Id.*, 5:13-18. The claim contains no information regarding the creation of a route, and thus claim 1 is ambiguous as to whether claim 1's "said route" is a created route, any route anywhere, or how it is related to the other recited limitations. And, the claims and specification fail to specify what the route is created between or what the route connects. Thus, it is impossible to ascertain what the "route" is and renders the claim meaningless including the other limitations such as obtaining the related "route-related information" as claimed in claims 1 and 6.

Additionally, in the prosecution history, the applicant disclaims creating a new route, stating that U.S. Patent No. 5,922,049 to Radia et al. ("*Radia*") "does not disclose '**updating a route table item** in a route table based on said route-related information,' as required by claim 1. By contrast, *Radia* creates a route, <u>not</u> updates an existing route (or entry)." Ex. 14, the '839 patent Prosecution History, 258-68 (emphasis in original). Thus, the applicant expressly disavowed creating a route. *Thorner*, 669 F.3d 1362 at 1365. But, as discussed above, the only recitation of any "route" in the specification or the abstract is "a method for creating routes." *Id.*, Abstract; *see id.*, 3:14-19. Thus, nothing in the specification or abstract provides support for anything other than

creation of a route, although this is exactly what the applicants expressly disavowed. Thus, even if the limitation that the claimed route is "existing" is read into the independent claims, nothing in the specification, claims, or prosecution history describes what the existing route is meant to be, what the existing route connects, or how the existing route relates to the other elements of the claims.

### 2. WSOU's allegation that Defendants are seeking to construe two terms is incorrect.

WSOU's allegation that Defendants are seeking to construe two terms here is incorrect. As demonstrated by Defendants' argument above, the argument for "route" and "route-related information" are linked and related.

### B. Term 2: "said predefined using time indicates[ing] a [the] using time of said route" (Claims 1 and 6)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)." |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

### 1. The term "said predefined using time indicates[ing] a [the] using time of said route"

The term "said predefined using time indicates[ing] a [the] using time of said route" as used in claims 1 and 6 is internally inconsistent and thus indefinite. Under the logic of the claim, the predefined using time is predefined. The predefined using time cannot then "indicat[e] a using time of said route" unless the using time is equal to the <u>predefined</u> using time, as in the using time was defined before it was used (i.e., predefined). This term is not amenable to claim construction because "using time" as a distinct term from "the predefined using term" and thus presumably has a different meaning. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d

1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."). Yet, exemplary claim 1 expressly states the "predefined using time indicates a using time."  The specification is silent on this issue, merely restating that "the predefined using time is used to indicate the using time of said route," '839 patent, 6:28-30, with no further explanation or description. Thus, the claim's recitation fails to distinctly point out what is being claimed because this limitation  is not amenable to construction and fails to inform with reasonable certainty the scope of the invention. *Nautilus*, 572 U.S. at 901.

WSOU addresses a different part of the specification when it discusses a "using time," where the specification recites "the predefined using time indicating the time which **<u>can be</u>** used by said route." WSOU Opening Brief, p. 18 (citing '839 patent, 5:13-15). However, claims 1 and 6 do not recite this language, which does not recite "using time" at all, but rather that the predefined using time "indicates[ing] a [the] using time of said route," which is recited elsewhere in the specification. The '839 patent, 6:28-30. Thus, WSOU is incorrect to cite to the former recitation in the specification, as the claims recite a different portion with different language.

### C.     Term 3: "using time" (Claims 1, 6)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Claim 6: Indefinite for lack of antecedent basis under 35 U.S.C. § 112(b) |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

### 1.     The term "using time" lacks antecedent basis in claim 6

The term "using time" as used in claim 6 lacks antecedent basis and is thus indefinite. The claims recite "the using time" but fail to recite "a using time," or a "use of time." This is not an

antecedent basis issue that may be fixed in hindsight because it is unclear what "using time" is being referred to and whether the "using time" refers to the "predefined using time," or a different "using time." WSOU's defense is that the specification contains the same language. WSOU Opening Brief, pp. 18-19.[5]   However, the specification's lack of clarity does not resolve the ambiguity in claim 6.

## VII.   U.S. Patent No. 9,185,036 (Case No. 6:20-cv-00494-ADA)

### A.   Term 1: "data flow" / "to enable thereby the control of at least one data flow" / "data flow is controlled" / "a data flow" / "the data flow" (Claims 1, 6,-10, 12, 17-21, and 23-24)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under 35 U.S.C. § 112 ¶ 2. |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

### 1.   The '036 patent specification fails to describe the claimed "data flow"

The use of the claim term "data flow" in claims 1, 6-12, 17-21, 23, and 24 is indefinite. The claims and the specification fail to distinctly point out what is claimed. In each independent claim, the claims recite "to enable thereby control of at least one data flow," but the claims and specification fail to state how the data flow is controlled. Further, the claims and specification provide no indication of any sort of measure of whether the data flow is being controlled or not.

---

[5] Defendants originally proposed an alternate construction—"lease time"—for this term based on the specification, but Defendants have since removed the alternate for consideration. Further, WSOU's post-hoc rationalization that this alternative definition in the specification is "merely exemplary" is not supported by the specification. The specification specifically states twice that "the using time is the lease time." 839 patent, 6:10-14, 7:21-24. For instance, the dependent claim 5's narrowing limitation is that the using time, or the lease time, is "in the dynamic configuration protocol response message" not that the "using time comprises a lease time" or that the "using time is a lease time."

Under this broad recitation, turning the network off, through power or disconnection, would accomplish control of the data flow. The claims recite that data flow is "restricted" or it may be controlled "in a manner tending to reduce the congestion condition," but the claims and the specification provide no indication of what this means. Indeed, the specification fails to discuss "restriction" of any data flow at all. Likewise, the specification fails to discuss what "a manner tending to reduce the congestion condition" is. These terms all link back to the ambiguity of what it means "to enable thereby control of at least one data flow" and that "data flow is controlled." This term, and the constituent terms of "data flow" are thus indefinite.

The claim also fails to recite what the claimed "data flow" is connecting to. The claim only recites that the "data flow" is "in a network," but a network is by definition a group of interconnected things. The claim fails to state what interconnected things are in the claimed network, and the claim further fails to state what the data flow moves between within the network. This is ambiguous because it is unclear what claimed "data flow" is being controlled, where the "data flow" is being controlled, and how the "data flow" is being controlled. Thus, the claim is indefinite.

Claims 7-9 and 18-20 do not resolve the ambiguity and are also indefinite. Claims 7-9 and 17-19 recite that "the data flow is controlled by dropping at least a portion of those packets" associated with source and/or destination addresses. These claims fail to recite or discuss how the packets relate to the claimed "data flow" or any other term in the claims other than the source and/or destination addresses. These claims also fail to discuss at what point in the network the packets are dropped. In theory, packets could be lost at anywhere in the claimed "network," such as a word document on a computer in the network, and this claim limitation would be satisfied. Thus, this claim limitation fails to inform with reasonable certainty the scope of the invention.

Further, the recited "data flow" in claims 1 and 23 present separate terms that present further ambiguity and is thus indefinite. Exemplary claim 1 is as follows:

1. A method for controlling data flow in a network, comprising:

> detecting a congestion condition at a network node in the network; and
> sending a congestion message from the network node at which the congestion
>> condition is detected toward one or more network nodes upstream of the
>> congestion condition;
> wherein the congestion message comprises an indication that a congestion
>> condition exists;
> wherein the congestion message comprises address information of at least one
>> end-node associated with the congestion condition to enable thereby the
>> control of **at least one data flow** in a manner tending to reduce the
>> congestion condition;
> wherein the congestion message comprises a MAC address associated with **a data**
>> **flow** to be restricted such that the congestion may be reduced or the
>> congestion message comprises a MAC address pair associated with **a data**
>> **flow** to be restricted such that the congestion may be reduced.

(emphasis added).

Claims 1 and 23 recite the restriction or control of three different recitations of "data flow." The use of "a data flow" denotes new different data flows from the claimed "at least one data flow." The claim and the specification fail to recite or describe where the "one data flow" is or what it flows between, much less whether the network includes three separate data flows or where the data flows come from or where they go or the relation of the three data flows to the other limitations of this claim. The specification and prosecution history contains no discussion of this claim language, *see* Ex. 8, '036 patent; '036 Prosecution History, as the new "data flow" recitations were added in amendment ten years after this application was filed to overcome patentability rejections. *Id*. at 441-51. It is impossible to discern what these data flows move between or what the three different recitations of "data flow" are meant to represent. For the above reasons, the claim term "data flow" fails to inform with reasonable certainty the scope of the invention.

27

     **2.**     **WSOU's allegation that Defendants are seeking to construe five terms is incorrect.**

WSOU's allegation that Defendants are seeking to construe five terms here is incorrect. Defendants are seeking to construe the "data flow" as used in its various forms. Which data flow is being claimed is important to understanding what is being claimed. Therefore, there is just one claim to be construed here.

**B.**     **Term 2: "congestion condition to enable thereby the control of at least one data flow in a manner tending to reduce the congestion condition" / "congestion condition" / "indication that a congestion condition exists" (Claims 1, 12, 23, and 24)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Indefinite under 35 U.S.C. § 112(b)" |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

     **1.**     **The '036 patent specification fails to describe the claimed "congestion condition"**

The use of the claim term "congestion condition" in claims 1-4, 6, 12-15, 17, 23, and 24 is indefinite. The claims and the specification fail to distinctly point out what is claimed. In each independent claim, the claims recite "wherein the congestion message comprises an indication that a congestion condition exists; wherein the congestion message comprises address information of at least one end-node associated with the congestion condition to enable thereby the control of at least one data flow in a manner tending to reduce the congestion condition," but the claims and specification fail to state how the congestion message enables control or what it means to control data flow in a manner tending to reduce the congestion condition. These terms are ambiguous because anything that does or does not reduce congestion would satisfy the claim limitations, such as turning off the network and disconnecting the network. Further, the claims and specification

provide no indication of any sort of measure of whether the data flow is controlled "in a manner tending to reduce the congestion condition."  Under this limitation, congestion could increase or stay the same and this claim limitation would be satisfied.

Furthermore, the claim fails to recite any defining features of the claimed "congestion condition," including what a congestion condition is. The network could be unplugged or disconnected and thus unable to send a data flow, and this "congestion condition" would satisfy this claim limitation. The claim does recite the "congestion condition" is detected "at a network node in the network," but fails to state what this means.  For example, the congestion condition could be internal to the network node,  it could reflect that the network node does not have power, or it could refer to communications received from outside the network into the network node.  The Specification refers to links and queues, '839 patent, 3:28-4:14, 4:35-42, but those links are not recited in the claims and it is unclear what from the specification would explain how the links and queues work with the claimed "congestion condition."

### 2.    WSOU's allegation that Defendants are seeking to construe three terms is incorrect.

WSOU's allegation that Defendants are seeking to construe three terms here is incorrect. Defendants are seeking to construe the "congestion condition" as used in its various forms. How congestion condition is used in the claims at various times is important to understanding what is being claimed. Therefore, there is just one claim to be construed here.

### C.    Term 3: "end-node associated with the congestion condition" (Claims 1, 12, 23, and 24)

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Written description/enablement under 35 U.S.C. § 112(a)." |

First, Defendants incorporate their arguments noted above for the Preliminary Issues in Section III.

      **1.**      **The '036 patent specification does not contain a written description of or enable a POSA to practice the claimed "end-node associated with the congestion condition"**

The term "end-node associated with the congestion condition" is invalid because the specification lacks written description and an enabling disclosure. Each independent claim, claims 1, 12, 23, and 24 recite "wherein the congestion message comprises address information of at least one end-node associated with the congestion condition." However, the term "end-node associated with the congestion condition," is not discussed or recited anywhere in the specification or the original application papers, and the claims do not contain enough definition to determined what the end-node associated with the congestion condition is. The applicant made an amendment after a first rejection of the '232 patent application, 1.5 years after filing, when the term "at least one end-node associated with the congestion condition" was first introduced in the claims. Ex. 8, '036 Prosecution History at 49-59. Before the amendment, the claims recited the term "at least one node associated with the congested condition." The applicant's amendment here renders the claim as lacking written description because the claims and specification do not describe an end-node associated with the congestion condition. The claims even specifically state that the claimed congestion condition is detected "at a network node in the network" and thus it is ambiguous what relationship the end-node has with the congestion condition. Because the specification and claim lack sufficient description and fail to enable a POSA to practice the invention with respect to the claimed "end-node associated with a congestion condition," this claim is invalid under § 112(a). *Halliburton*, 514 F.3d 1244 at 1249.

## VIII.   CONCLUSION

For the foregoing reasons, Defendants request that the Court adopt Defendants' proposed constructions.

DATED:  April 9, 2021                      Respectfully submitted,

                                           /s/ Lionel M. Lavenue
                                           Lionel M. Lavenue
                                           Virginia Bar No. 49,005
                                           lionel.lavenue@finnegan.com
                                           **FINNEGAN, HENDERSON, FARABOW,
                                           GARRETT & DUNNER, LLP**
                                           1875 Explorer Street, Suite 800

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system on April 9, 2021.

*/s/ Lionel M. Lavenue*

Lionel M. Lavenue