# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-00487-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-00488-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-00494-ADA** |
| *Plaintiff*, | § | **CIVIL ACTION 6:20-cv-00496-ADA** |
| | § | |
| v. | § | |
| | § | |
| **ZTE CORPORATION, ZTE (USA)** | § | |
| **INC. AND ZTE (TX), INC.,** | § | |
| *Defendant.* | § | |

## PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF

**Table of Contents**

I.   U.S. Patent No. 7,489,929 (Case No. 6:20-cv-00488-ADA) .................................................. 1

    1.   "buffering bearer traffic" (claim 11) ........................................................................... 1

    2-3. "characteristic" and "replacement hysteresis" (claim 14) ......................................... 3

II.  U.S. Patent No. 7,742,534 (Case No. 6:20-cv-00496-ADA) .................................................. 4

    4-5. "maximal number of sub-carriers" (claim 4) & "maximum . . ." (claim 7) ................ 4

    6.   "means for selecting a set of sub-carriers from the plurality of sub-carriers on which user data is to be communicated from a transmitter to a receiver, . . ." (claim 6) ............................................................................................................................ 6

    7.   "means for determining quality levels for sub-carriers" (claim 6) ............................. 8

    8-9. "quality levels" (claims 1-3, 5-9, 13, 16-18) & "as a function of" (claims 1, 6, 16) ................................................................................................................ 10

III. U.S. Patent No. 8,451,839 (Case No. 6:20-cv-00487-ADA) ............................................... 10

    10-11.   "route-related information" (claims 1, 3, 6, 8) & "route" (claims 1, 6, 11) ............. 10

    12.  "said predefined using time indicates a using time of said route" (claims 1, 6) .............. 11

    13.  "the using time" (claim 6 only) ................................................................................ 12

IV.  U.S. Patent No. 9,185,036 (Case No. 6:20-cv-00494-ADA) ............................................... 13

    14-18.   Five distinct phrases reciting "data flow" in various contexts .................................. 13

    19-21.   Three distinct phrases reciting "congestion condition" in various contexts ............. 14

    22.  "end-node associated with the congestion condition" (claims 1, 12, 23, 24) .................. 15

## TABLE OF AUTHORITIES

**Cases**

*Application of Ehrreich*,
    590 F.2d 902 (C.C.P.A. 1979) ............................................................................................ 13

*Augme Techs., Inc. v. Yahoo! Inc.*,
    755 F.3d 1326 (Fed. Cir. 2014) .......................................................................................... 11

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ............................................................................................ 5

*Cellular Comms. Equip. LLC, v. Samsung Elec. Co. Ltd., et al.*,
    No. 6:14-CV-759, *Markman* Order (Dkt. 206) (E.D. Tex. March 29, 2016) ................ 9, 10

*CIF Licensing, LLC, d/b/a/ GE Licensing, v. Agere Systems, Inc.*,
    No. 07-170-JJF, *Markman* Order (D. Del. July 10, 2008) ................................................. 9

*Cisco Sys., Inc. v. TQ Delta, LLC*,
    928 F.3d 1359 (Fed. Cir. 2019) ............................................................................................ 3

*Dayco Prod., Inc. v. Total Containment, Inc.*,
    258 F.3d 1317 (Fed. Cir. 2001) ............................................................................................ 1

*North American Vaccine, Inc. v. American Cyanamid Co.*,
    7 F.3d 1571 (Fed. Cir. 1993) .............................................................................................. 11

*Playtex Prod., Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005) .............................................................................................. 5

*Process Control Corp. v. HydReclaim Corp.*,
    190 F.3d 1350 (Fed. Cir. 1999) .......................................................................................... 13

*S3 Inc. v. NVIDIA Corp.*,
    259 F.3d 1364 (Fed. Cir. 2001) .......................................................................................... 13

*Seattle Box Co. v. Indus. Crating & Packing, Inc.*,
    731 F.2d 818 (Fed. Cir. 1984) .............................................................................................. 5

*Smith & Nephew, Inc. v. Ethicon, Inc.*,
    276 F.3d 1304 (Fed. Cir. 2001) .......................................................................................... 13

I.   **U.S. Patent No. 7,489,929 (Case No. 6:20-cv-00488-ADA)**

1.   **"buffering bearer traffic" (claim 11)**

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | During a handoff process, all data from the mobile station is buffered at the mobile station or all data at the network side is buffered at the network side until the handoff process is complete. |

The parties agree claim 11 expressly qualifies "buffering" "in terms of *what* must be buffered (i.e., "buffering *bearer traffic*") and *when* (i.e., "while performing steps (A) though (F)" of claim 1)." Dkt. 61 at 2; *see also* Dkt. 69 at 7 (conceding claim 11 "requires specifically what must be buffered and when.").[1] However, ZTE admits its proposed construction would redefine "buffering" in terms of *what* (i.e., "all data from the mobile station" or "at the network side") and *when* (i.e., "until the handoff process is complete"). Dkt. 69 at 7. As WSOU explained, it would be erroneous to requalify "buffering" in terms of *what* and *when* where the claim language already expressly qualifies "buffering" in *both* contexts. Dkt. 61 at 2 (collecting cases). ZTE offers no rebuttal to these previously raised points. ZTE also ignores the authority WSOU cited. *Id*.

Compounding its error, ZTE acknowledges its construction would add extraneous limitations further directed to "*where* to buffer and *how long* to buffer." Dkt. 69 at 7 (emphasis original). ZTE fails to meet its burden to show that such additional limitations are either expressed in the claim language or are "unambiguously required" by the intrinsic evidence. *Dayco Prod., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001).

Faced with no *intrinsic* evidence to satisfy ZTE's burden, ZTE points only to *extrinsic* evidence, which ZTE cites as "Wiley-IEEE Electrical and Electronics Engineering Disctionary [sic], p. 84 (2004)." Dkt. 69 at 7. ZTE waived reliance on extrinsic evidence by failing to timely identify any for this term in its *Markman* disclosures. Dkt. 67-3 at 18. ZTE should have brought, but failed to bring, this deficiency to the Court's attention. In any event, ZTE's waived *extrinsic* evidence is not part of the *intrinsic* record and thus cannot supply any unambiguous requirement for the extraneous limitations ZTE seeks to add. *Dayco,* 258 F.3d at 1327.

---

[1] The opening and responsive *Markman* briefs are cited herein as Dkt. 61 and Dkt. 69, respectively.

1

By its own party admission, ZTE defeats its attempt to restrict the claimed "buffering" in terms of *location*. ZTE acknowledges that "data can be buffered . . . at a place other than the mobile station and the network side." Dkt. 69 at 7. ZTE identifies no unambiguous disclaimer in the intrinsic evidence that would preclude this admitted possibility. Accordingly, by its own admission, ZTE refutes its erroneous interpretation that the claimed "buffering" should be restricted to occurring *only* at either "the mobile station" or "the network side." *Id*.

ZTE also fails to identify any intrinsic evidence unambiguously requiring the extraneous *durational* requirement ZTE seeks to add (i.e., "until the handoff process is complete"). ZTE incorrectly asserts that "the claim term itself fails to inform a person of ordinary skill in the art (POSITA) the metes and bounds of the alleged invention." Dkt. 69 at 8. Absent from ZTE's response brief is any mention of the explicit requirement in claim 11 that the "buffering" must occur "while performing steps (A) though (F)" of claim 1 (the "while" qualification). Dkt. 61 at 2. It remains undisputed that ZTE's *unrecited* "until …" qualification is precluded by, and inconsistent with, the *recited* "while" qualification. *Id*. (collecting cases).

It also remains undisputed that certain dependent claims, when understood in the context of the "while" qualification, further refute ZTE's attempt to add the extraneous durational requirement, "until the handoff process is complete." *Id*. Keeping in mind that claim 11 recites the "buffering" need only occur "while performing steps (A) though (F)," certain dependent claims confirm steps (A) through (F) are not necessarily exhaustive. This is because certain dependent claims recite other processing steps in addition to steps (A) through (F) (*e.g.*, claims 6, 8-10, etc.).

Thus, contrary to what ZTE argues, without citation, WSOU did not argue "the buffering should be terminated before the handoff process is complete." Dkt. 69 at 10. Rather, WSOU has consistently maintained (and ZTE failed to dispute) that because the claim language expressly qualifies the "buffering" in terms of "while performing steps (A) through (F)," and given steps (A) through (F) are not necessarily exhaustive of the entire process (*e.g.*, in view of *additional* steps recited in dependent claims), it would be improper to redraft the claim language with ZTE's extraneous durational requirement, "until the handoff process is complete."

ZTE also grossly mischaracterizes the opening brief as "merely amount to attack [sic] to the '929 patent specification for lack of Enablement." Dkt. 69 at 9-10. WSOU correctly characterized the passage ZTE relies upon as merely exemplary and not containing any lexicography. Dkt. 61 at 4 (discussing '929 patent at 6:34-30). It is introduced as a non-limiting "feature *of the disclosed example*." '929 patent at 6:34 (emphasis added). ZTE did not dispute these observations. Under the circumstances, it would be a "cardinal sin" to import the cited disclosure as claim limitations. *Id*. (citation omitted). Indeed, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Cisco Sys., Inc. v. TQ Delta*, *LLC*, 928 F.3d 1359, 1364 (Fed. Cir. 2019).

ZTE further mischaracterizes the opening brief as misinterpreting what "all data" means in the context of the cited disclosure. Dkt. 69 at 9. There is no need to interpret "all data," *in the context of that non-limiting description of an example embodiment*, because it is neither lexicographic nor recited in the claims. Moreover, as explained above, and in WSOU's opening brief, claim 11 already expressly defines the "buffering" in terms of *what* is being buffered—i.e., "buffering *bearer traffic*." ZTE concedes the point. *Id*. at 7 ("Buffering bearer traffic . . . requires specifically what must be buffered."). This is independently fatal to ZTE's "all data" importation.

**2-3.** **"characteristic" and "replacement hysteresis" (claim 14)**

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112(b). |

ZTE offers no evidentiary basis, and no analysis of any intrinsic evidence, in support of its attorney argument that the terms "characteristic" and "replacement hysteresis" are both indefinite. Indeed, the only reference to the term "replacement hysteresis" in ZTE's response is in the *ipse dixit* statement that the term is allegedly "indefinite under 35 U.S.C. § 112(b)." Dkt. 69 at 14. This cannot possibly overcome the presumption of definiteness by clear and convincing evidence.

It remains undisputed that a person of ordinary skill in the art would understand the term "replacement hysteresis" with reasonable certainty, including in view of at least the exemplary

3

passage WSOU identified in its opening brief. Dkt. 61 at 7 (citing '929 patent, 2:59−3:2). ZTE's only gripe is that the exemplary passage cited in the opening brief allegedly does not also "support[] the term 'characteristic.'" Dkt. 69 at 13. ZTE erroneously conflates the issue of *definiteness* with the distinct issue of whether there is sufficient *written description support*. ZTE not only misstates the standard,[2] but also misplaces the burden in alleging, incorrectly, that WSOU "was unable to point" to any written description support for the "characteristic" term. *Id*.

While the burden never shifts to WSOU to defend the presumption of definiteness, WSOU again points to the previously cited passage, which ZTE failed to substantively address, as exemplary disclosure also pertaining to the "characteristic" term. Dkt. 61 at 7 (citing '929 patent, 2:59−3:2). The cited passage discloses "pilot signal strength" as an example of the "characteristic" term. *Id*. In the disclosed example, a comparison involving "pilot signal strength" is used to determine whether to newly include a candidate base station as part of an active set. *Id*. This counterexample independently refutes ZTE's attempt to castigate the "characteristic" term as an unsupported "drafting error made by the patentee." *See* Dkt. 69 at 13 (citation omitted).

Accordingly, by ignoring the intrinsic evidence altogether, and by failing to advance any *evidence* allegedly supporting its position, ZTE has failed to meet its burden to overcome the presumption of definiteness by clear and convincing evidence for either one of the disputed terms.

## II. U.S. Patent No. 7,742,534 (Case No. 6:20-cv-00496-ADA)

### 4-5.    "maximal number of sub-carriers" (claim 4) & "maximum . . ." (claim 7)

| WSOU's Position | ZTE's Position |
| --- | --- |
| Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112(b). |

ZTE makes no distinction between the words "maximal" and "maximum" (as recited in claims 4 and 7, respectively) in arguing that (1) these words are "terms of degree" and (2) there is "no description regarding . . . what constitutes when a maximum or maximal number of subcarriers is reached." Dkt. 69 at 14. ZTE is wrong in both respects.

---

[2] Elsewhere, ZTE cites outdated caselaw no longer valid under *Nautilus*. Dkt. 69 at 13 (quoting *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003)).

ZTE fails to explain why maximum[al] are allegedly terms of degree. The disputed terms are objectively determinable and are distinguishable from what courts have identified as "words of degree," such as "about," "approximately," and "substantially." *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984); *see also Playtex Prod., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) (referring to "approximate," "substantial," "generally," and "about" as terms of degree). No words of degree are at issue here.

Without offering any expert opinion, ZTE misinterprets the specification as lacking any guidance. Dkt. 69 at 14. Claim 4 recites "maximal" as an additional requirement tethered to the "threshold" limitation of claim 1—i.e., "[m]ethod according to claim 1, *wherein said threshold is related* to a maximal number of sub-carriers to be used." '534 patent, 6:16-17 (claim 4) (emphasis added). Consistent with this claim language, the specification contains exemplary disclosure directed to the concept of sending indications of a threshold related to a max number of carriers to select. For example, the specification describes an example embodiment, in part, as follows:

> The indication related to a threshold can be a number of sub carrier to select. Then if this indication is N, the receiver should select the N sub-carriers having the highest quality level.

'534 patent at 4:11-14. In this example, the selecting is limited by the system to a threshold number of N sub carriers. The number N is, therefore, an *actual number* and not a term of degree. Additional examples are disclosed. *See, e.g., id.* at 3:26-32; 4:1-65; 5:27-32; 5:48-52. In one example, the maximum number "N is set to 8" (4:29); and in another, a maximum number of sub carriers (or "SCGs") is set to 4 and 2 for terminals A and B, respectively (4:51-56). In short, the specification sufficiently informs claim scope with reasonable certainty to one of ordinary skill.

The authority ZTE cites is inapposite. Dkt. 69 at 15. In *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363–64 (Fed. Cir. 2018), for example, the indefiniteness issue arose from the couplet "minimal redundancy" because it was unclear *how much redundancy* is permitted. Here, by contrast, "maximal" expressly modifies "number" in the phrase "said threshold is related to a *maximal number* of sub-carriers to be used" (as recited in claim 4). In this context, the threshold is quite simply a set *number* not to be exceeded, where the *number itself* represents *how much*.

5

*Berkheimer* is further distinguishable in that the opinion relied heavily on expert testimony concerning the perspective of one of ordinary skill and concerning the lack of any corresponding example in the specification. *Id*. Here, by contrast, ZTE opted to not offer any expert testimony whatsoever; and, as emphasized above, the '534 patent discloses specific examples.

6. **"means for selecting a set of sub-carriers from the plurality of sub-carriers on which user data is to be communicated from a transmitter to a receiver, . . ." (claim 6)**

| WSOU's Position | ZTE's Position |
|---|---|
| **Governed by 35 U.S.C. § 112, ¶ 6.**[3] **Function:** selecting a set of sub-carriers from the plurality of sub-carriers on which user data is to be communicated from a transmitter to a receiver" | |
| **Structure**: transmitter configured to perform corresponding operation(s), such as, (i) receive quality levels from receiver, (ii) transmit threshold indication to receiver, (iii) select the set of sub-carriers based at least in part on either the received quality level or the transmitted threshold indication (or both). | **Structure:** none and hence indefinite under 35 U.S.C. § 112(b). |

As WSOU previously explained, ZTE exceeded the Court's limit on the number of disputed terms, including by refusing to count the "means for selecting" term separate and apart from the "means for determining" term. Dkt. 61 at 10. ZTE responds that those two distinct terms should be counted as one because the analysis is "intertwined" and both terms appear in the same claim. Dkt. 69 at 16. But ZTE refutes its own excuse by (1) acknowledging that these two terms, if construed, must be addressed individually and by (2) proposing distinct means-plus-function constructions for each term. Indeed, as shown by the renumbering of terms set forth herein, ZTE seeks to construe far more than the limit of twelve terms ordered by the Court.

Based on ZTE's reduced list of disputed terms, which the Court ordered ZTE to provide, WSOU's opening brief addressed the *second* "means for selecting" term recited in claim 6 (at 6:41-42). Dkt. 61 at 9-12. ZTE faults WSOU for misidentifying the functional language. Dkt. 69 at 18. However, ZTE failed to inform the Court (and WSOU) that ZTE has abandoned its indefiniteness challenge of the *second* "means for selecting" term and has unilaterally focused the dispute, instead, on the *first* "means for selecting" term, as recited in claim 6 (at 6:24-34).

---

[3] Both parties agree that this term invokes means-plus-function construction, and further agree as to the functional language, though ZTE inexplicably continues to cite the inapplicable AIA statute.

6

ZTE's identification of functional language of the *first* "means for selecting" term does not include the following qualifying language directed to the "selecting" itself:

> said selecting based at least in part on at least one of sub-carrier quality levels and a threshold indication associated with sub-carriers, said quality levels communicated from the receiver to the transmitter and said threshold indication communicated from the transmitter to the receiver; said threshold indication and said quality levels enabling said receiver to deduce said set of sub-carriers on which said user data is to be communicated[.]

'543 patent at 6:27-34 (claim 6) (the "selecting" qualifiers). Because neither party has identified the above "selecting" qualifiers as part of the functional requirement for the *first* "means for selecting" term, it remains undisputed that the "selecting" qualifiers are *structural* and meaningfully limit *how* the "selecting" is performed. Moreover, the "selecting" qualifiers themselves recite algorithmic structure for the transmitter by reciting limitations directed to "at least one of sub-carrier quality levels and a threshold indication associated with sub-carriers," where the selecting of the set of sub-carriers, at the transmitter, is performed "based at least in part on" either the received quality level or the transmitted threshold indication (or both). *Id*.

The written description provides additional detail concerning corresponding structure. With reference to "Step 21" of Figure 2, the specification discloses that a transmitter may transmit to a receiver an indication related to a threshold. *Id*. at 3:46-59. Example thresholds are disclosed. *Id*. at 4:11-18; 5:19-32. With reference to Figure 1, the specification states quality levels may be received at the transmitter from the receiver, for example, "according to a method object of a parallel European patent application Nr 05 290 0177 filed by the applicant and incorporated herein by reference." *Id*. at 3:17-24. As another example, the communicated quality level may be "a bit error rate." *Id*. at 3:25-26. With reference to Figure 3, the specification identifies a "transmitter" as example structure for "selecting a set of sub carriers on which the user data are to be transmitted to a receiver . . . so that the receiver can deduce from concordant information available at the transmitter as well as at the receiver the set of sub carriers which will be used for transmission." *Id*. at 5:10-18. "[C]oncordant information available at the transmitter as well as at the receiver" may be used in selecting "the set of sub carriers which will be used for transmission." *Id*.

7

A disclosed example of selecting using this concordant information involves "arranging the sub carriers in quality level decreasing order and to select the sub carriers starting with the sub carrier having the highest quality level and continuing to select the sub carriers with decreasing quality level until the indication related to a threshold is reached." *Id*. at 4:6-10. This example of selecting is also reflected in claim 9 (which depends from claim 6). *Id*. at 6:65-67. If the threshold indicates "a number of sub carriers to select," for example, the "N sub-carriers having the highest quality level" may be selected. 4:11-14. If the threshold is associated with quality, then those sub carriers having a quality level higher than the threshold indication may be selected. *Id*. at 4:15-18.

ZTE's conclusory attorney argument that no corresponding structure is disclosed is plainly inconsistent with the intrinsic evidence. By contrast, ZTE offered no evidence, much less clear and convincing evidence, to overcome the presumption of definiteness.

**7.** **"means for determining quality levels for sub-carriers" (claim 6)**

| WSOU's Position | ZTE's Position |
|---|---|
| **Governed by 35 U.S.C. § 112, ¶ 6.**[4] **Function:** "determining quality levels for sub-carriers" | |
| **Structure**: receiver configured to perform corresponding operation(s), such as measure the SIR for sub carriers (*see*, *e.g.*, 5:19-24). | **Structure:** none disclosed, and hence indefinite under 35 U.S.C. § 112(b). |

ZTE fails to defend, and rather refutes, its own theory that no corresponding structure is disclosed for the "means for determining" term of claim 6. ZTE admitted the "receiver" recited in claim 6 is corresponding structure by stating in its response that "'means for determining' [is a] key component[] *of the receiver*."[5] Dkt. 69 at 17 (emphasis added). Nevertheless, ZTE advances the mere attorney argument, without any evidentiary support, that "the '534 patent specification does not provide any structure of the claimed 'receiver'" and that "[a] person of ordinary skill in

---

[4] While WSOU maintains this term does not invoke 35 U.S.C. § 112, ¶ 6, for brevity, it focuses the instant response on its alternative construction under 35 U.S.C. § 112, ¶ 6.

[5] ZTE further asserts that the "means for selecting" is a key component of the receiver. It is unclear, however, whether ZTE's assertion refers to the *first* or the *second* "means for selecting" recited in claim 6. WSOU agrees claim 6 expressly tethers the *second* "means for selecting" (the term addressed in WSOU's opening brief) to the claimed "receiver." Dkt. 61 at 11-12. That claim 6 recites two "means for selecting" confirms the *first* refers to *transmitter* structure.

the art (POSITA) would not even understand the claimed . . . 'means for determining' [is] hardware or software." Dkt. 69 at 17. ZTE's attorney argument is plainly inconsistent with the specification.

ZTE opted to not dispute or even acknowledge several points raised in the opening brief. First, Figure 4 and its accompanying description expressly identify the receiver as corresponding structure. Dkt. 61 at 11. Second, the specification supports interpreting the claimed "receiver" *itself* as connoting definite structure, including by describing a preferred embodiment as follows: "the receiver is a terminal of an OFDMA system for example but not restricted to HSDPA or WIMAX." *Id*. at 12 (quoting '534 patent at 5:53-55). Third, Figure 1 schematically illustrates the receiver as a structural component of the mobile terminal 11. *Id*. Each point stands unrebutted.

ZTE also overlooks, for example, the following example description of *how* the receiver may perform the claimed determining: "[t]he concordant information are quality information preferably in form of Signal to Interference Ratio (SIR) for the different sub carriers which are preferably measured at the receiver and send back to the transmitter on a feedback channel so that the information are available on both side of the radio link and are concordant." *Id*. at 5:19-24. In view of the intrinsic evidence, if the term is deemed subject to § 112, ¶ 6, the corresponding structure encompasses at least a receiver (*e.g.*, of a mobile terminal) configured to perform certain corresponding operation(s), such as measure the SIR for sub carriers. *Id*.

The single case ZTE cites is inapposite. It does not address a "receiver" term or whether "receiver" itself connotes structure. Other courts, however, have found that "receiver," or a "mobile terminal" having receiver functionality, connote definite structure. *See*, *e.g.*, *CIF Licensing, LLC, d/b/a/ GE Licensing, v. Agere Systems, Inc.*, No. 07-170-JJF, *Markman* Order (D. Del. July 10, 2008) (construing "receiver" as "any structure capable of receiving an electrical signal"); *Cellular Comms. Equip. LLC, v. Samsung Elec. Co. Ltd., et al.*, No. 6:14-CV-759, *Markman* Order (Dkt. 206) at *31-32 (E.D. Tex. March 29, 2016) (construing corresponding structure of "receiving means for" term as "a mobile terminal, and equivalents thereof").[6]

---

[6] *Cellular* identified "a mobile terminal, and equivalents thereof" as corresponding structure for

9

8-9. "quality levels" (claims 1-3, 5-9, 13, 16-18) & "as a function of" (claims 1, 6, 16)

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary. | One of a signal-to-interference ratio, a bit error rate, or a modulation scheme. |

ZTE improperly attempts to introduce a new indefiniteness theory for both disputed terms, contrary to its prior *Markman* disclosures and ZTE's own expression of its claim construction position (as set forth in the table above). Dkt. 69 at 19. This new and inconsistent theory should be deemed waived, particularly given it is not even expressed as ZTE's current position.

ZTE failed to overcome the "especially strong" presumption against "import[ing] virtually the entirety of claim 8, verbatim, into claim 6," as ZTE proposes. Dkt. 61 at 13-14 (citing *SunRace Roots Enterprise Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1302–03 (Fed. Cir. 2003)). According to ZTE, this "especially strong" presumption is inapplicable here because "quality levels" and "as a function of" are both recited in the same claim. Dkt. 69 at 19 n.4. But the "especially strong" presumption under *SunRace* arises here for each term independently, not from a comparison between the terms. This is because ZTE proposes a construction (for both terms) that would erroneously incorporate limitations of claim 8 into claim 6. That certain claims recite both disputed terms gives rise to an *additional* presumption against adopting the same construction for each, as ZTE proposes. Dkt. 61 at 13 (citing *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.")).

III. U.S. Patent No. 8,451,839 (Case No. 6:20-cv-00487-ADA)

10-11. "route-related information" (claims 1, 3, 6, 8) & "route" (claims 1, 6, 11)

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112(b). |

---

multiple "means for" terms recited in the same claim. *Cellular*, Slip Op. at *38. This refutes ZTE's undefended assertion that different "means for" terms of the same claim cannot possibly share corresponding structure. Dkt. 69 at 17. *Cellular* also considered and rejected the argument that the terminal cannot be corresponding structure where the specification allegedly "fails to adequately disclose what structure '*within* the terminal' performs the function." *Cellular,* Slip Op. at *31. According to the reasoning in *Cellular*, that issue "might perhaps pertain to enablement, but . . . does not affect the claim construction analysis as to the corresponding structure." *Id.*

ZTE's fails to prove indefiniteness, with clear and convincing evidence, by its attorney argument that "[t]he specification and claims fail to state what the claimed route is or what it connects to." Dkt. 69 at 21. The lack of lexicography does not render "route" indefinite, but rather supports applying the ordinary meaning. Moreover, the specification provides sufficient guidance, as evidenced by the fact that the word "route" appears nearly *two-hundred* times in the '839 patent.

ZTE also raises the attorney argument that "said route" is indefinite as allegedly lacking antecedent basis. *Id*. The term "said route" is consistently recited in the claims only after first introducing "route information" in the preamble (*see*, *e.g.*, 8:60, 9:28) and "route-related information" in the body of the claim (*see*, *e.g.*, 8:62, 9:32-33). One of ordinary skill in the art would recognize that "route-related information" is information related to a route. Accordingly, there *is* sufficient antecedent basis for the "said route" term.

ZTE's erroneous prosecution disclaimer argument does not support its indefiniteness theory. That the applicant persuasively distinguished "updating a route table item in a route table based on said route-related information" from merely creating a new route, without any such "updating" step once the route has been created, does not render the claim language indefinite.

**12.     "said predefined using time indicates a using time of said route" (claims 1, 6)**

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112(b). |

ZTE's sole reliance on attorney argument fails to prove indefiniteness by clear and convincing evidence. ZTE's theory is essentially that "predefined using time" is indefinite because "using time" cannot be "predetermined" *before* it is used. Dkt. 69 at 23. ZTE cannot prove *indefiniteness* by raising erroneous attorney argument directed, instead, to alleged *inoperativeness* of the claim language. *See North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993); *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1340 (Fed. Cir. 2014).

The weakness of ZTE's theory is further demonstrated by ZTE's retreat from exemplary disclosure. For example, a preferred embodiment invokes the same "predefined" qualifier by stating "the predefined using time indicating the time which can be used by said route." '839

11

patent, 5:13-15. The phrase "can be used" confirms "using time" can be "predefined" *before* it used. Recognizing this, ZTE argues WSOU cites to the wrong part of the specification, and that a proper construction should *exclude* this preferred embodiment, because it does not track the claim language verbatim. Dkt. 69 at 24. ZTE ignores that the disclosure in question is the *only* portion of the written description that expressly references "S12" of Figure 2. '839 patent, 5:9-18. Figure 2 rephrases block S12 as follows: "obtaining route-related information and a predefined using time from said access response message, the predefined time is used *to indicate the using time of said route*. *Id*., Fig. 2, S12 (emphasis added). Because S12 also closely tracks the claim language, one of ordinary skill would recognize, with reasonable certainty, that claim scope encompasses not only S12 of Figure 2, but also the only corresponding written description of S12 (*e.g.*, at 5:9-18).

ZTE also mischaracterizes the intrinsic evidence as being "silent" on the claim language in question and providing "no further explanation or description" apart from restating the claim language itself. Dkt. 69 at 24. As explained above, ZTE failed to recognize the written description of S12 is relevant to, and is encompassed by, the claim language in question. ZTE also overlooks, for example, certain additional corresponding disclosure, and certain limitations of dependent claims reflecting the same, stating that "said predefined using time refers to the lease time in said dynamic host configuration protocol [("DHCP")] response message." *See*, *e.g.*, '839 patent at 6:11-14, 7:21-24, 9:24-26 (claim 5), and 10:32-34 (claim 10).

13. **"the using time" (claim 6 only)**

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | Indefinite for lack of antecedent basis under 35 U.S.C. § 112(b).[7] |

ZTE failed to prove, by clear and convincing evidence, that the phrase "*the* using time" is indefinite as allegedly lacking antecedent basis. ZTE rests entirely on its erroneous conclusion, without offering any accompanying evidence or rational underpinning. Dkt. 69 at 24. ZTE compounds its error in reducing WSOU's opening brief to merely asserting "that the specification

---

[7] ZTE abandoned, without explanation, its prior argument that the term "using time" (as recited in claim 6) means "lease time." Evidently ZTE recognized that offering a definition for a term undercuts an argument that the term is allegedly indefinite. Dkt. 61 at 19.

contains the same language." *Id*. Because ZTE opted to not substantively address the counterpoints raised in WSOU's opening brief, those points stand unrebutted. Dkt. 61 at 18-19. For example, WSOU observed, and ZTE did not dispute, that because claim 6 repeatedly uses the word "said" *when making antecedent reference*, use of the word "the" in the phrase "*the* using time" is a meaningful distinction. *Id*. WSOU had further pointed out, and ZTE again opted to not dispute, that "use of the definite article 'the' in the phrase 'the using time of said route' simply underscores that 'said predefined using time' must refer to 'the using time of said route,' and not just any route." *Id*. (citation omitted). WSOU had further observed that the specification similarly uses the phrase "the using time" in an analogous context. *Id*. This latter observation is the only one ZTE acknowledged, yet ZTE offered no rebuttal other than its unavailing, *ipse dixit* statement that "the specification's lack of clarity does not resolve the ambiguity in claim 6." Dkt. 69 at 25. ZTE simply has failed to overcome the presumption of definiteness for "the using time."

## IV. U.S. Patent No. 9,185,036 (Case No. 6:20-cv-00494-ADA)
### 14-18. <u>Five</u> distinct phrases reciting "data flow" in various contexts

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112(b). |

ZTE fails to prove indefiniteness, by clear and convincing evidence, for any of the five "data flow" phrases. ZTE erroneously conflates *definiteness* with the distinct requirements of *written description* or *enablement* by arguing "the claims and specification fail to state how the data flow is controlled." Dkt. 69 at 25. Definiteness is an analytically distinct requirement. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1358 n.2 (Fed. Cir. 1999); *Application of Ehrreich*, 590 F.2d 902, 906 (C.C.P.A. 1979) ("The second paragraph of § 112 pertains only to claims. Agreement, or lack thereof, between the claims and the specification is properly considered only with respect to the first paragraph of § 112; it is irrelevant to compliance with the second paragraph of that section."). Further, claims do not have to be self-contained units defining and teaching the claimed technology. *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1369 (Fed. Cir. 2001); *Smith & Nephew, Inc. v. Ethicon, Inc.*, 276 F.3d 1304, 1311 (Fed. Cir. 2001).

Heightening its error, ZTE overlooks, or unduly discounts, surrounding claim language that expressly qualifies, or otherwise provides informative context for, respective "data flow" terms. Claim 1, for example, recites "the control of at least one data flow *in a manner tending to reduce the congestion condition*." '036 patent at 6:62-64. Claim 1 further qualifies "data flow" as having "a MAC address" or "a MAC address pair" associated therewith. *Id*. at 6:65-7:2. Claim 6 further qualifies the "MAC address pair" of claim 1. *Id*. at 7:19-21. Claim 7, which depends from claim 6, further qualifies "data flow" as being "controlled by dropping at least a portion of those packets associated with the destination address." *Id*. at 7:22-24. Claims 8 and 9 each recite respective limitations directed to how the data flow is controlled. *Id*. at 7:25-33. Independent claim 12 and certain claims depending therefrom recite analogous limitations to claim 1 and certain claims depending therefrom. *See*, *e.g.*, *id*. at 7:40-53; 8:5-17. ZTE's conclusory characterization of the claims is plainly inconsistent with what the claims in fact recite.

Notably, ZTE does not argue that "data flow" is *itself* indefinite, but rather that the varying surrounding claim language allegedly does not express limitations directed to "what the claimed 'data flow' is connecting to." Dkt. 69 at 26. Here again, ZTE improperly suggests each claim must be a self-contained unit defining and teaching the claimed technology. That is not the standard. ZTE also overlooks, for example, that certain dependent claims qualify "data flow" as having "a source [MAC] address and a destination [MAC] address." '036 patent at 7:19-21 (claim 6) and 8:5-7 (claim 17). This claim language is consistent, for example, with exemplary disclosure directed to "the MAC address of a source node generating the data flow" (*id*. at 2:3-5) and "a destination node to which the data is flowing towards" (*id*. at 2:53-54).

**19-21. Three distinct phrases reciting "congestion condition" in various contexts**

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112(b). |

ZTE fails to prove indefiniteness, by clear and convincing evidence, for any of the various "congestion condition" phrases. ZTE rehashes its legally and factually flawed indefiniteness theory for the various "data flow" terms, addressed above, by arguing that "the claims and

14

specification fail to state how the congestion message enables control or what it means to control data flow in a manner tending to reduce the congestion condition." Dkt. 69 at 28. As explained above, one of ordinary skill would be able to ascertain, with reasonable certainty, what controlling data flow means within the context of the claims. *See supra*, discussion of terms 14-18 (*e.g.*, addressing exemplary claim language directed to flow control). Furthermore, the specification discloses examples of how the congestion message may enable control:

> The controlling action comprises, illustratively, dropping all or some percentage of packets destined for the MAC addresses mentioned in the congestion message (or the source destination pair). The controlling action may also be modified according to a service level agreement (SLA) associated with the congested node(s). For example, flow control may be implemented in a manner that . . . .

'036 patent at 5:46-52; *see also*, *generally*, *id*. at 5:11–6:2.

ZTE compounds its error by arguing, without specifying a particular claim, that "the claim fails to recite any defining features of the claimed 'congestion condition,' including what a congestion condition is." Dkt. 69 at 29. ZTE overlooks, for example, that certain dependent claims expressly qualify the "congestion condition" as being determined (1) "when a queue maximum occupancy is exceeded" (claims 2 and 13); (2) "when data received by the network node exceeds an output link capability of the network node" (claims 3 and 14); or (3) "when a queue data drop rate exceeds a threshold level" (claims 4 and 15), including where "the threshold level is determined with respect to at least one of an amount of data dropped, an amount of data dropped over time and a number of data drops over time" (claims 5 and 16). The independent claims encompass respective dependent claims which expressly qualify the "congestion condition" term. Furthermore, the specification provides clarifying examples reflecting claim language directed to the "congestion condition" term. *See*, *e.g.*, '036 patent at 4:35-42; Fig. 3.

22. **"end-node associated with the congestion condition" (claims 1, 12, 23, 24)**

| WSOU's Position | ZTE's Position |
|---|---|
| Plain and ordinary meaning. | Written description/enablement under 35 U.S.C. § 112(a). |

Under recent guidance from the Court, sent via email to counsel, ZTE's written description and enablement challenges are, at best, premature. This was anticipated by WSOU. Dkt. 61 at 23.

15

Dated: April 23, 2021　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　By:　　*/s/ Ryan S. Loveless*
　　　　　　　　　　　　　　　　　　　James L. Etheridge
　　　　　　　　　　　　　　　　　　　Texas Bar No. 24059147
　　　　　　　　　　　　　　　　　　　Ryan S. Loveless
　　　　　　　　　　　　　　　　　　　Texas Bar No. 24036997
　　　　　　　　　　　　　　　　　　　Brett A. Mangrum
　　　　　　　　　　　　　　　　　　　Texas Bar No. 24065671
　　　　　　　　　　　　　　　　　　　Travis L. Richins
　　　　　　　　　　　　　　　　　　　Texas Bar No. 24061296
　　　　　　　　　　　　　　　　　　　Jeff Huang
　　　　　　　　　　　　　　　　　　　Etheridge Law Group, PLLC
　　　　　　　　　　　　　　　　　　　2600 E. Southlake Blvd., Suite 120 / 324
　　　　　　　　　　　　　　　　　　　Southlake, TX 76092
　　　　　　　　　　　　　　　　　　　Tel.: (817) 470-7249
　　　　　　　　　　　　　　　　　　　Fax: (817) 887-5950
　　　　　　　　　　　　　　　　　　　Jim@EtheridgeLaw.com
　　　　　　　　　　　　　　　　　　　Ryan@EtheridgeLaw.com
　　　　　　　　　　　　　　　　　　　Brett@EtheridgeLaw.com
　　　　　　　　　　　　　　　　　　　Travis@EtheridgeLaw.com
　　　　　　　　　　　　　　　　　　　Jeff@EtheridgeLaw.com

　　　　　　　　　　　　　　　　　　　Mark D. Siegmund
　　　　　　　　　　　　　　　　　　　State Bar No. 24117055
　　　　　　　　　　　　　　　　　　　mark@waltfairpllc.com
　　　　　　　　　　　　　　　　　　　Law Firm of Walt, Fair PLLC.
　　　　　　　　　　　　　　　　　　　1508 North Valley Mills Drive
　　　　　　　　　　　　　　　　　　　Waco, Texas 76710
　　　　　　　　　　　　　　　　　　　Telephone: (254) 772-6400
　　　　　　　　　　　　　　　　　　　Facsimile: (254) 772-6432

　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiff WSOU Investments, LLC*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on April 23, 2021.

/s/ *Ryan S. Loveless*
Ryan S. Loveless